**JEPSON, INCORPORATED and Ko Shin Electric and Machinery Company, Limited, Plaintiffs,**

v.

**MAKITA ELECTRIC WORKS, LIMITED, Makita USA, Incorporated and Makita Corporation of America, Defendants–Appellants,**

and

**William A. ZEITLER, Douglas J. Colton and Verner, Liipfert, Bernhard, McPherson & Hand, Appellants,**

v.

**BLACK & DECKER, INCORPORATED, Appellee.**

No. 92–3687.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1994.

Decided July 26, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 22, 1994.*

* Hon. John L. Coffey did not participate in the consideration of the suggestion for rehearing en banc.

Jeffrey A. Orr, Frederick J. Sujat, Klayman & Associates, Washington, DC, for plaintiffs.

James K. Gardner (argued), Phil C. Neal, James H. Bowhay, Ralph T. Russell, Bradley C. Twedt, Neal, Gerber & Eisenberg, Chicago, IL, for Makita Elec. Works, Ltd., Makita USA, Inc., Makita Corp. of America, William A. Zeitler, Douglas J. Colton, Verner, Liipfert, Bernhard, McPherson & Hand.

Raymond P. Niro, John C. Janka (argued), Niro, Scavone, Haller & Niro, Chicago, IL, Mark D. Gately, Daniel R. Lanier, Steven F.

Barley, Miles & Stockbridge, Baltimore, MD, for Black & Decker, Inc.

Before CUMMINGS, KANNE, and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

Jepson, Inc. and Ko Shin Electric and Machinery Co., Ltd. filed suit against Makita U.S.A., Inc., Makita Corporation of America and Makita Electric Works, Ltd. (hereafter collectively referred to as "Makita") for alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* and various state law provisions.

During discovery, Makita served a Notice of Deposition on the Black and Decker Corporation ("Black & Decker"), pursuant to Fed.R.Civ.Pro. 30(b)(6), seeking to depose a representative of Black & Decker knowledgeable about "foreign and domestic competition in the United States power tool industry; the geographic and product markets for power tools in the United States; the importation into the United States of power tools; the manufacturers and importers of power tools sold in the United States and their product lines and sales; labeling of domestic content requirements; trademarks of power tools in the United States; the reputation and performance of power tools manufactured in the United States and abroad."[1] In response to the Notice of Deposition, Black & Decker offered the testimony of Joseph Galli, Jr., Vice President of Marketing for Black & Decker's power tools group.

Prior to Galli's deposition, Makita and Black & Decker entered into a Stipulated Protective Order which provides in pertinent part:

1. This Protective order shall apply to all information conveyed by Black & Decker, Inc. (hereinafter termed "conveying party") to another party (hereinafter termed "receiving party") in this action pursuant to the Deposition Subpoena and Notice of Deposition served upon it.... CONFI-

---

1. The Notice of Deposition was not sealed by the parties and is part of the public record of this case.

DENTIAL MATERIALS are any DIS-COVERY MATERIALS that contain trade secrets or other confidential research, development, financial, corporate, or commercial information of the conveying party. Subject to the terms set forth below, all information produced by the conveying party shall be used by the receiving party solely for the purposes of preparing for and conducting this action and shall not be used for any other purpose.

2. Counsel for the conveying party may designate as CONFIDENTIAL MATERIALS **any deposition testimony** that counsel in good faith considers to contain or reflect research, financial, commercial, business or other information that the conveying party deems confidential.

. . . .

9. In the event counsel for the party receiving CONFIDENTIAL MATERIALS objects to the designation of any or all such items as being designated CONFIDENTIAL MATERIALS, said counsel shall advise the conveying party, in writing, of such objections and the reasons therefore. If the parties fail to resolve the dispute among themselves, it shall be the obligation of the party objecting to the designation of material as CONFIDENTIAL MATERIALS to file, within (5) days after notifying the conveying party of its objections, an appropriate motion to obtain a prompt ruling from the Court concerning the confidentiality of the items in dispute. . . .

Through an oversight, the Stipulated Protective Order was never submitted to the district court.

The parties to the litigation, but not Black & Decker, further stipulated to an Agreed Interim Protective Order ("IPO") which provides in pertinent part:

1. [T]he following information shall be considered "Confidential Material" and may be used in this action as set forth in this Interim Protective Order ("IPO"), subject to objections from opposing parties: All documents, things, pleadings, and deposition transcripts labeled "Confidential" produced or taken by plaintiffs and defendants from each other or from third parties in this litigation, subject to challenge by any opposing party(s) within 20 days of entry of this IPO or 10 days of production, whichever is later.

. . . .

4. Recipients of Confidential Material shall not reveal, reproduce, disclose, or describe the Confidential Material, or the contents of Confidential Material, in whole or in part, to any person other than a person authorized to receive such documents. . . . Recipients of Confidential Material shall use such material only for purposes of this action and for no other purpose.

The IPO was signed by Magistrate Judge Edward A. Bobrick on May 30, 1991.

On June 5, 1991 Makita took Galli's deposition. Before Galli began his testimony, Black & Decker's attorney designated "the entire context of Mr. Galli's deposition testimony . . . as confidential pursuant to paragraph 3 of the stipulated protective order. . . ." Makita did not challenge the designation of Galli's testimony as confidential within the ten day period required by the IPO.

In May of 1992, Black & Decker filed a petition with the United States International Trade Commission ("ITC") alleging that Makita was "dumping" professional power tools in the United States at less than fair market value within the meaning of 19 U.S.C. § 1673 *et seq.* During an ITC Preliminary Conference, Gary DiCamillo, President of Black & Decker's power tool group, gave testimony on what constitutes a like-product for purposes of the ITC's investigation.[2] After DiCamillo testified, William Zeitler, one

---

**2.** If the ITC determines that goods are being imported into the United States and sold at less than fair market value, it must determine whether such sales are injurious to a domestic industry. Before it can make such a determination, the ITC must determine the appropriate U.S. industry by defining which "like products" are includable within the applicable market. *See* 19 U.S.C. §§ 1677(4)(A), 1677(10). The ITC may hear evidence concerning the "like-product" issue at what is called a Preliminary Conference. 19 C.F.R. § 207.15.

of Makita's attorneys, made the following statement:

> I would like to at this point bring to the panel's attention two significant facts. There is an anti-trust case currently pending, where a number of depositions have been taken of Black & Decker officials and other officials in the domestic industry. All of these depositions directly pertain to the issue currently before this panel on what constitutes the appropriate like-product. We would like to ask at this point if the good samaritans at Black & Decker would object to our releasing of all this deposition testimony from their individuals to this panel for its use. These depositions are currently under a protective order. Obviously, Black & Decker can release that information to this panel. And we would like to know if they would be willing to do so now, in which case we would be willing and able to introduce it in our post-hearing brief.

At the same hearing, Douglas Colton, another attorney for Makita, made the following statement:

> Specifically, we are referring to a deposition which was conducted on June 5, 1991, of Mr. Joseph Gally, [sic] Jr., who identified himself as the vice president of marketing for Black & Decker's power tools in the United States. I personally conducted the deposition. This is a transcript of it. At the time the deposition was taken, long before this action was contemplated, a number of questions were asked with regard to markets, who sells what to whom, who buys what, and so on. We had agreed with Black & Decker at the time of the deposition to enter a protective order which said that the document of the deposition would only be used in the context of the litigation in which [it] was taken. And of course we deemed that to be an agreement we made, and is binding. But is waiveable by Black & Decker.

Shortly after the ITC Preliminary Conference, Mark D. Gately, one of Black & Decker's attorneys, wrote Makita's counsel to express his belief that Makita had violated the IPO by discussing Galli's testimony in the ITC Preliminary Conference. Gately also indicated that he would recommend to Black & Decker that it seek sanctions for any further violation of the IPO. Thereafter, Makita made reference to Galli's deposition in its ITC Post–Conference Brief:

> Specifically, on June 5, 1991, Douglas Colton on behalf of Makita deposed (technically, in the Chicago case) on oral examination, under oath, Mr. Joseph Galli, Jr., Vice President for Marketing for U.S. power tools for Black & Decker. By agreement with counsel for Black & Decker, this deposition was made subject to a protective order that prohibits its release by Makita without consent from Black & Decker or a court order. The deposition directly addresses many of the issues in this matter, particularly the "like product" issue. Makita believes that the contents of this deposition are highly pertinent to the claims now being made by Black & Decker. Makita strongly urges that the ITC request Petitioner to provide the ITC with a copy of this transcript.

Black & Decker subsequently filed a Motion for Enforcement of Protective Orders and for Sanctions in the district court, alleging that Makita violated the IPO "by revealing, disclosing, and describing Mr. Galli's deposition" in the ITC proceeding. Makita responded by filing a memorandum in opposition to Black & Decker's Motion for Enforcement of Protective Orders and Sanctions. Makita also filed a motion requesting that it be allowed to use the non-confidential portions of Galli's deposition testimony in the ITC proceeding.

The district court granted Black & Decker's motion and sanctioned Makita's counsel $5,000. *Jepson, Inc. v. Makita Elec. Works, Ltd.*, 143 F.R.D. 657 (N.D.Ill.1992). The court initially found that it had no authority to enforce the Stipulated Protective Order because it was not signed by the court or entered as a Fed.R.Civ.P. 26(c) protective order. *Id.* at 660. Nonetheless, the court found that the IPO was enforceable and that Makita had violated its terms by informing the ITC of the existence of Galli's deposition. It also found that Makita "revealed" and "described" Galli's testimony in part "by stating that 'a number of questions were asked

with regard to markets, who sells what to whom, who buys what, and so on.'" *Id.* at 661. According to the court, "[i]nforming the ITC of the subject matter of the deposition while noting that the deposition was being withheld pursuant to a protective order, in effect, disclosed the substance of the testimony." *Id.* at 662. The court denied Makita's request to modify the IPO so that it could use certain portions of Galli's deposition in the ITC proceeding. Makita now appeals.

## Discussion

■ Absent a protective order, parties to a law suit may disseminate materials obtained during discovery as they see fit. *See Oklahoma Hosp. Ass'n v. Oklahoma Pub. Co.,* 748 F.2d 1421, 1424 (10th Cir.1984), *cert. denied,* 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed.2d 652 (1985) ("While it may be conceded that parties to litigation have a constitutionally protected right to disseminate information obtained by them through the discovery process absent a valid protective order, it does not follow that they can be compelled to disseminate such information.") (citation omitted). Moreover, "[a]s a general proposition, pretrial discovery must take place in the [sic] public unless compelling reasons exist for denying the public access to the proceedings." *American Tel. & Tel. Co. v. Grady,* 594 F.2d 594, 596 (7th Cir.1978), *cert. denied,* 440 U.S. 971, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979).

Rule 26(c) of the Federal Rules of Civil Procedure permits the district court, "[u]pon motion by a party or by the person from whom discovery is sought, and *for good cause shown* ... [to] make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: ... (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way...." (emphasis added).

In this case, the parties to the litigation, but not Black & Decker, stipulated to the terms of the IPO. Such stipulated protective orders are relatively common. As one court recently noted, "[t]here appears to be a growing tendency throughout both federal and state courts, especially in commercial cases, for litigants to agree to seal documents produced during the discovery process as well as pleadings and exhibits filed with the court." *Nault's Auto Sales, Inc. v. American Honda Motor Co.,* 148 F.R.D. 25, 43 (D.N.H.1993).

Stipulated protective orders place the district court in an unusual position. Normally, the court is quick to ratify (and rightly so) any area of agreement between opposing parties. However, under Fed.R.Civ.Pro. 26(c), the district court has the power to issue a protective order only upon a showing of "good cause." Even if the parties agree that a protective order should be entered, they still have "the burden of showing that good cause exists for issuance of that order. It is equally apparent that the obverse also is true, i.e., if good cause is not shown, the discovery materials in question should not receive judicial protection...." *Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775, 789 (1st Cir.1988), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989) (quoting *In re Agent Orange Prod. Liab. Litig.,* 821 F.2d 139, 145–146 (2d Cir.), *cert. denied sub nom. Dow Chem. Co. v. Ryan,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987)).

■ In deciding whether to issue a stipulated protective order, the district court must independently determine if "good cause" exists. *See Nault's Auto Sales,* 148 F.R.D. at 44. As one commentator recently stated:

When all the parties support the protective order or seal, as often is the case when the defendant seeks confidentiality and the plaintiff wants to facilitate its own access to discovery materials, the court is faced with an essentially non-adversarial situation and must assume the duty of making an independent inquiry. A useful analogue is the fiduciary burden assumed by federal judges in evaluating a proposed class action settlement under Federal Rule 23(e).

Arthur R. Miller, *Confidentiality, Protective Orders and Public Access to the Courts,* 105 Harv.L.Rev. 427, 492 n. 322 (1991).

■ In this case, there is no indication that the Magistrate Judge made an independent determination that "good cause" existed

before issuing the IPO. The IPO itself contains no explicit or implicit reference to "good cause" and the district court made no specific finding of "good cause" elsewhere in the record. Moreover, there is no evidence to indicate that the court reviewed Galli's deposition testimony to determine whether it in fact contained confidential information. The district court's failure to make a "good cause" determination requires us to independently determine whether "good cause" existed to prevent Makita from discussing the relevant portions of Galli's deposition in the ITC proceeding. *Cf. United States v. Kentucky Utils. Co.*, 124 F.R.D. 146 (E.D.Ky. 1989), *rev'd on other grounds*, 927 F.2d 252 (6th Cir.1991) (stipulated confidentiality orders should not be given binding effect even if they are endorsed by the court—court should balance the interests between privacy and public access at the time the motion to modify a protective order is made).

■ Makita wanted to introduce Galli's deposition at the ITC Preliminary Conference because Gary DiCamillo, President of Black & Decker's U.S. Power Tool Group, gave the following testimony at that conference:

Now, consumer electric power tools are very, very different from professional electric power tools. Professional electric power tools are used primarily by tradesmen, such as carpenters and electricians, who need rugged products that can stand up to day-in, day-out, continuous use. Consumer power tools are used primarily by do-it-yourselfers for around the home repair and fix-up jobs. Professional power tools are designed to be more powerful, to handle heavier workloads, to sustain overloading and overheating for longer periods of time than their consumer counterparts. Consumer power tools are normally used less frequently and for lighter duty tasks.

The rule of thumb is, if you use power tools for a living, you would use professional power tools, in the same way that if you were a cameraman, you would not use a Sony camcorder to film a television show or a movie. You would use a professional camera.

. . . .

Professional and consumer products are not interchangeable. Tradesmen cannot use a consumer power tool as a substitute for professional power tools, because it is not durable enough to withstand heavy, professional use. If we marketed consumer tools as professional tools, we would destroy our reputation and our customer base.

Theoretically, nothing would prevent a home owner from using a professional power tool for consumer use. But as a practical matter, the average home owner does not need, nor are they willing to pay substantially higher prices for professional power tools.

. . . .

*In summary then, the application of the Commission's traditional like-product factors to the products in question, shows that there is a clear dividing line between consumer and professional power tools, in both of the like-product categories that are subject to this investigation.*

(emphasis added).

Galli, on the other hand, gave quite different testimony at his deposition:[3]

Q. —in your view, was there a clear-cut distinction between consumer electric power tools and professional electric power tools? Did they exist in just completely separate boxes with no crossover.

A. There are—we, again, we look at the market in two ways; as a total power tool market and we do segment the market and say that these are, these are graded consumer tools and these are professional grade tools. But your question, there are, you can definitely buy, a professional user could buy a consumer tool or professional tool. He's confronted with that option. So the answer would be both.

---

**3.** Makita previously filed a motion to file Galli's deposition under seal in this court. As is obvious from this opinion, we grant that motion.

Q. In your own experience, in fact, do so-called professional tools sometimes get bought by consumers and so-called consumer tools sometimes get bought by professionals?

A. Yes.

. . . .

Q. Do professional and consumer level tools compete with each other?

A. Yes.

Q. Is there, in effect, a continuum with let's say extremely low quality and low price at one end and extremely high quality and price at the other end in the electric power tools?

A. Yes.

Q. Is there a middle ground where they tend to blend? As the quality comes up, the price goes up from one direction; quality and price both come down from the other direction, does that happen?

A. In the continuum, I think the answer to the first question would answer the same thing for the second part. The answer would have to be yes.

As is readily apparent, this portion of Galli's testimony does not contain trade secrets or "confidential research, development, or commercial information." Galli's testimony simply confirms what is common-sense knowledge in many industries—that consumers crossover to purchase products aimed at different segments of the market. Moreover, it is apparent that Black & Decker did not consider discussion of the like-product issue confidential. DiCamillo gave public testimony during the ITC Preliminary Conference concerning this very issue.

Black & Decker has tried to use the stipulated protective order and the IPO as shields to prevent highly relevant and nonconfidential information from reaching the ITC. We refuse to assist Black & Decker with its effort. Black & Decker has completely failed to show "good cause" for the protective order, in so far as the like-product portion of Galli's deposition is concerned. Therefore, we reverse the district court's imposition of sanction's against Makita's counsel.

*Makita's Motion to Modify the IPO*

▮  Next, we consider whether the district court correctly denied Makita's motion to modify the IPO. After Black & Decker filed its Motion for Enforcement of Protective Orders and Sanctions, Makita filed a motion, seeking an order permitting it to use portions of Galli's deposition testimony in the ITC proceeding. This motion was, in effect, a motion for modification of the IPO.

In *Wilk v. American Medical Ass'n,* 635 F.2d 1295, 1299 (7th Cir.1980), we held that "where an appropriate modification of a protective order can place private litigants in a position they would otherwise reach only after repetition of another's discovery, such modification can be denied only where it would tangibly prejudice substantial rights of the party opposing modification." (citations omitted).

In *Wilk,* five chiropractors filed suit against the AMA, several other national medical associations, and various individuals, alleging antitrust violations. Pursuant to a motion filed by the *Wilk* defendants, the district court entered a protective order prohibiting, *inter alia,* the plaintiffs' counsel from divulging any document labeled confidential.

The State of New York subsequently filed a law suit in the Eastern District of New York against many of the same medical associations named as defendants in *Wilk.* The state moved to intervene in *Wilk* for the limited purpose of modifying the protective order. The state "sought access to the protected materials on the same terms as the *Wilk* plaintiffs." *Id.* at 1297. The district court denied New York's request for modification of the protective order. We reversed, noting that:

"[a]s a general proposition, pre-trial discovery must take place in the [sic] public unless compelling reasons exist for denying the public access to the proceedings." *Grady,* 594 F.2d at 596. This presumption should operate with all the more force when litigants seek to use discovery in aid of collateral litigation on similar issues, for in addition to the abstract virtues of sunlight as a disinfectant, access in such cases materially eases the tasks of courts and

litigants and speeds up what may otherwise be a lengthy process. Particularly in litigation of this magnitude, we ... are impressed with the wastefulness of requiring the State of New York to duplicate discovery already made.

*Id.* at 1299 (footnote omitted).

*Wilk* has been followed by this and other circuits. *See Grove Fresh Distribs., Inc. v. Everfresh Juice Co.,* 24 F.3d 893 (7th Cir. 1994) (remanding denial of a motion to modify a protective order for reconsideration in light of *Wilk* ); *Matter of Film Recovery Sys., Inc.,* 804 F.2d 386 (7th Cir.1986) (State of Illinois was entitled to a modification of a protective order in order to gain access to documents relevant in a pending case); *Beckman Indus., Inc. v. International Ins. Co.,* 966 F.2d 470 (9th Cir.1992), *cert. denied sub nom. International Ins. Co. v. Bridgestone/Firestone, Inc.,* —— U.S. ——, 113 S.Ct. 197, 121 L.Ed.2d 140 (1992) (affirming the district court's modification of a protective order to allow an intervening party to obtain depositions for use in a pending case).

In this case, Makita sought modification of the IPO, so that it could use Galli's deposition testimony in the ITC proceeding. Pursuant to federal law, the ITC has the authority to access and copy "any document, paper, or record, pertinent to the subject matter under investigation...." 19 U.S.C. § 1333(a)(1). Furthermore, the ITC "may order testimony to be taken by deposition in any proceeding or investigation pending before the commission at any stage of such proceeding or investigation." 19 U.S.C. § 1333(d).

Galli's deposition is relevant to an issue pending before the ITC and is thus discoverable by the ITC. Accordingly, like the situation in *Wilk,* the district court's refusal to modify the protective order forces Makita and the ITC to duplicate discovery that has already been made. As we indicated in *Wilk,* such unnecessary duplication is wasteful.

Duplication of discovery may be excused, however, if modification of the protective order will "tangibly prejudice substantial rights of the party opposing modification." *Wilk,* 635 F.2d at 1299. Black & Decker has made no showing that its substantial rights will be prejudiced by modifying the IPO to allow Galli's deposition to be used in the ITC proceedings. For instance, Black & Decker does not claim that Galli's deposition is privileged from discovery by Makita or the ITC.

We therefore hold that the district court erred in refusing to modify the IPO to allow Makita to use Galli's deposition before the ITC.

### Conclusion

For all of the foregoing reasons, the decision of the district court is REVERSED and this case is REMANDED with instructions to grant Makita's request to modify the IPO.