In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3375

RHONDA SALMERON,

*Plaintiff-Appellant*,

*v.*

ENTERPRISE RECOVERY SYSTEMS, INC., et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 4453—**Milton I. Shadur**, *Judge.*

ARGUED MAY 14, 2009—DECIDED AUGUST 27, 2009

Before RIPPLE, MANION, and TINDER, *Circuit Judges.*

MANION, *Circuit Judge.*  After her employer Enterprise Recovery Systems ("ERS") fired her, Rhonda Salmeron brought this qui tam action on behalf of the United States against ERS alleging that it committed fraud in its student loan debt collection practices. Salmeron subsequently amended her complaint three times to add USA Funds, Inc.; USA Group Guarantee Services, Inc.; USA Servicing Corp.; Sallie Mae, Inc.; Sallie Mae Servicing, L.P.;

and Scott Nicholson as defendants. During the lawsuit's three-year sojourn in the district court, Salmeron's attorney, Jorge Sanchez, engaged in what the judge described as a "virtually unbroken pattern of dilatory and irresponsible conduct," consistently missing filing deadlines and failing to appear at status conferences. Fed up with Sanchez's repeated flouting of the court's rules, the district court dismissed the suit sua sponte. Though ultimately persuaded to reinstate the action, the district court issued a "final warning" to Sanchez that future misconduct would not be tolerated. Only a short time later, however, Sanchez breached an oral agreement he had with opposing counsel and leaked a document obtained through discovery to three separate sources. Upon finding the document posted on an Internet website, the defendants moved to dismiss the suit as a sanction for the unauthorized disclosure. The district court granted the motion, finding the leak "willful" and "inexcusable." Salmeron appeals, arguing that the punishment does not fit the offending conduct. We affirm.

I.

In its opinion and order dismissing the suit, the district court extensively chronicled the transgressions of Salmeron's counsel, Jorge Sanchez, during the course of this litigation. The day after the deadline to respond to ERS's motion to dismiss, Sanchez, citing his workload and personal issues as the reasons for the delay, filed a motion for permission to file the response late, which the district court granted. A few months later, Sanchez

missed the deadline to file a response to USA Funds's motion to dismiss. He again cited workload and family obligations and asked the court to excuse the late filing, which it did. A few months after that late filing, Sanchez failed to timely respond to USA Funds's request for production of documents and interrogatories; the responses to the interrogatories were not submitted until more than two and a half months after they were due. Sanchez also failed to appear at a scheduled status conference. Next, when responses to ERS's interrogatories and requests for production were already several weeks overdue, Sanchez reneged on a promise that he would provide the information. The court had to order Sanchez to comply.

Sanchez's dilatory conduct continued past the lawsuit's second anniversary. Nine days after Salmeron's response to ERS's motion to dismiss the second amended complaint was due, rather than belatedly attempting to respond, Sanchez instead filed a motion for leave to file a third amended complaint. The court applied ERS's motion to the third amended complaint and set a new deadline for Sanchez's response. True to form, Sanchez missed that deadline. Again citing his workload, Sanchez moved for leave to file a response a week after the deadline had passed. The court and opposing counsel had been apprised of the motion only minutes before a scheduled status hearing. Nevertheless, the court granted that motion and set a deadline for Sanchez to file Salmeron's third amended complaint, which had yet to be filed.

Sanchez could not meet that deadline and asked for an extension, which the district court granted. But the ex-

tended deadline passed without Sanchez filing anything. Although the court's clerk called Sanchez to inquire about the status of the filing and was told it was forthcoming, Sanchez neither attended the status hearing scheduled shortly after the deadline nor filed the third amended complaint. Only after the court ordered Sanchez to file the third amended complaint or face dismissal did Sanchez finally file that document.

Despite these admonitions, Sanchez's foot-dragging continued. On March 7, 2008, in response to the defendants' motions to dismiss and for summary judgment, the court entered a scheduling order requiring Salmeron to respond by April 11. Predictably, Sanchez filed a motion for an extension on April 9, citing yet again his workload as a reason for delay. The court granted an extension until April 18, but that date passed without Sanchez filing a response to any of the motions. On May 1, Sanchez filed a motion to extend the filing date for the responses until May 6. The court granted that extension, but Sanchez failed to meet that extended deadline as well. On May 8, Sanchez contacted the court and requested a continuance of the status hearing scheduled for the next day, telling the court that the continuance was necessary so that he could file the delinquent responses before the hearing. Sanchez promised to have the responses filed by the afternoon of the next day, so the district court agreed to postpone the hearing until May 16. When, five days later, Sanchez still had not filed his responses, the district court finally got his attention: it entered an order dismissing the action for want of prosecution.

Sanchez moved to reopen the case, arguing that his failures as counsel should not be held against Salmeron. At a hearing on the motion, the district court reinstated the suit while, at the same time, giving Sanchez a stern warning about the consequences of future misconduct:

> Well, I guess the short answer is that with considerable diffidence, I'm going to grant the Rule 59[(e)] motion and permit the case to get back into a live posture, but I want to tell you now you have really had what amounts to the final warning, and we're not going to have any repetition of any of this, or it's going to result in a conclusion that you certainly won't desire and that . . . is really occasioned by this extended pattern of noncompliance.

Despite the second chance, Sanchez raised his misconduct to a more egregious level. On June 24, defendants USA Funds, Sallie Mae, and ERS learned that a scanned copy of the confidential document containing the Guarantee Services Agreement between Sallie Mae and USA Funds had been posted on a website known as Wikileaks.org ("Wikileaks").[1] Also posted was a summary of the document and 13 inflammatory questions about the possible "criminality" of the arrangement. Two

---

[1] "[F]ounded by Chinese dissidents, journalists, mathematicians and startup company technologists, from the US, Taiwan, Europe, Australia and South Africa," Wikileaks styles itself as "an uncensorable version of Wikipedia for untraceable mass document leaking and analysis." http://wikileaks.org/wiki/Wikileaks:About (last visited July 16, 2009).

days later, the *Chronicle of Higher Education* published an online article about the leaked document captioned "Contract Raises New Concern over Sallie Mae's Ties to Guarantor." The *Chronicle* claimed it had obtained the document several days before it appeared on Wikileaks and denied providing it to Wikileaks. Both the copy of the Guarantee Services Agreement leaked to Wikileaks and the copy provided to the *Chronicle* bore Bates stamps conclusively demonstrating that they originated from USA Funds's document production during this lawsuit.

USA Funds then moved to dismiss the suit as a sanction for the disclosure of the Guarantee Services Agreement.[2] Mark Sweet, USA Funds's counsel, signed an affidavit filed contemporaneously with the motion to dismiss asserting that Sanchez had agreed to treat the confidential documents disclosed by USA Funds during discovery as being for "attorneys' eyes only." This condition was to remain in place until such time as the existing protective order, entered earlier in the action when only ERS was a defendant, could be modified to include all parties. USA Funds also included the cover letter accompanying its first production of documents on January 31, 2007, wherein Sweet, writing to Sanchez, stated that USA Funds intended to seek confidential treatment for the Guarantee Services Agreement. Sweet

---

[2] Defendants Sallie Mae, Inc.; USA Group Guarantee Services, Inc.; USA Servicing Corp.; and Sallie Mae Servicing, L.P. soon joined that motion.

also wrote in that letter that he had "circulated a draft joint motion for entry of [a] modified protective order" and that USA Funds would "move for confidential treatment" of the Guarantee Services Agreement after the court entered that order. In a separate email communication with Sanchez, Sweet attached a draft protective order and asked Sanchez to add his changes. (Sanchez had told Sweet that he wished to modify the protective order to cover documents from Salmeron's home computer.) Sanchez replied that he would look over the proposed protective order and "give . . . any feedback or proposed modifications that [he] might have." Two months later, in a cover letter accompanying USA Funds's second production of documents, Sweet reminded Sanchez that USA Funds was going to seek confidential treatment for the Guarantee Services Agreement and requested Sanchez to provide his edits on the draft protective order so that the order could be entered. Sanchez never provided his promised changes to the proposed protective order. At the time of the leak, no protective order was in place.

USA Funds also included with its motion to dismiss an email exchange between its counsel and Sanchez that occurred shortly after it discovered the leak. In that exchange, Sanchez admitted that the document posted on Wikileaks was the same version of the Guarantee Services Agreement that USA Funds had produced in the lawsuit, but he placed the blame on USA Funds for never following up on the protective order with the district court. He also stated that USA Funds failed to indicate which documents "provided to plaintiff it considered to be confidential."

In his response to the motion to dismiss, Sanchez stated that the document "apparently ha[d] been leaked and published without plaintiff's counsel's knowledge or approval." At a hearing the next day, the district judge questioned Sanchez about how the document could have been leaked without his knowledge when the version of the Guarantee Services Agreement published on Wikileaks had the same Bates numbering as the version released during discovery. While denying giving the Guarantee Services Agreement to Wikileaks, Sanchez nevertheless backtracked and admitted that he had leaked the document to three different, unauthorized sources: his client, another attorney whom he was thinking about bringing on as co-counsel, and a reporter for the *Chronicle*. Finding Sanchez's justifications for his actions unpersuasive, the district court nonetheless allowed Sanchez to file a brief arguing why a sanction other than dismissal would be appropriate.

In that brief filed after the hearing, Sanchez admitted that, had he referred to the cover letters accompanying USA Funds's document disclosures, he would have known that USA Funds was seeking a confidential designation for the leaked document and would not have shared it with anyone, including the reporter for the *Chronicle*, whom Sanchez stated he had been "put[ting] off" for months before finally disclosing the document to him. However, Sanchez claimed he misplaced the cover letters and did not refer to them when he disclosed the document. Although he denied personally leaking the Guarantee Services Agreement to Wikileaks, Sanchez admitted that the attorney to whom he leaked the docu-

ment may have done so. He argued that his disclosure was inadvertent and that a monetary fine, and not dismissal, was the appropriate sanction.

The district court disagreed. In a comprehensive opinion, it found that Sanchez violated the "attorneys' eyes only" agreement he had reached with Sweet by willfully disseminating the Guarantee Services Agreement. The court also found that Sanchez had never given a convincing explanation for doing so. The court rejected Sanchez's argument that he should not be sanctioned because no protective order was in place protecting the document, finding instead that the lack of a protective order was "unquestionably due to Sanchez'[s] failure to provide a response as he had promised." Relying on its "inherent authority to rectify abuses to the judicial process," the court then decided that dismissal with prejudice was the proper sanction and dismissed the suit. Salmeron appeals.

## II.

On appeal, Salmeron challenges both the district court's factual findings supporting the dismissal sanction and its power to issue that sanction. A district court has inherent power "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). Sanctions meted out pursuant to the court's inherent power are appropriate where the offender has willfully abused the judicial process or otherwise conducted litigation in bad faith. *Maynard v. Nygren*, 332 F.3d 462, 470-71 (7th Cir.

2003). "Though 'particularly severe,' the sanction of dismissal is within the court's discretion." *Montano v. City of Chicago*, 535 F.3d 558, 563 (7th Cir. 2008) (quoting *Chambers*, 501 U.S. at 45); *accord Link v. Wabash R.R. Co.*, 370 U.S. 626, 633 (1962). While a district court must exercise caution and restraint in exercising its inherent power, *Schmude v. Sheahan*, 420 F.3d 645, 650 (7th Cir. 2005), our review of the district court's choice of sanction is deferential: "[f]indings of fact must stand unless clearly erroneous, and a district judge's decision that a party's misconduct is serious enough to justify dismissal with prejudice is reviewed for abuse of discretion." *Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Servs. Ams. LLC*, 516 F.3d 623, 625 (7th Cir. 2008). Accordingly, "[w]e will only reverse a district court's imposition of sanctions if one or more of the following is true: '(1) the record contains no evidence upon which the court could have rationally based its decision; (2) the decision is based on an erroneous conclusion of law; (3) the decision is based on clearly erroneous factual findings; or (4) the decision clearly appears arbitrary.'" *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 386 (7th Cir. 2008) (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 495 (7th Cir. 1996)).

We begin with Salmeron's challenges to the district court's factual findings, which we will reverse only if left with a "definite and firm conviction that a mistake has been committed." *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 790 (7th Cir. 2000). Salmeron first attacks the district court's finding that Sanchez and USA Funds's counsel, Mark Sweet, had agreed to keep the Guarantee

Services Agreement for "attorneys' eyes only" until the district court entered a protective order governing document disclosure between the parties. She does not dispute the existence of the "attorneys' eyes only" agreement. Rather, she argues that there is nothing in Sweet's declaration to support the district court's finding that Sanchez had agreed specifically to keep the Guarantee Services Agreement confidential. The problem with that argument is that Salmeron never seriously disputed in the court below that the Guarantee Services Agreement was covered by the "attorneys' eyes only" agreement. Although Sanchez at first claimed, in his email response to USA Funds after the leak, that USA Funds did not indicate which documents "it considered to be confidential," he later admitted that the cover letters accompanying USA Funds's document productions clearly showed that USA Funds was seeking a confidential designation for the Guarantee Services Agreement—which was all that was required to bring that document within the ambit of the "attorneys' eyes only" agreement.

Faced with that concession, Salmeron changes course and attempts to refashion the agreement on appeal. She latches onto the phrase in Sweet's affidavit that "USA Funds wanted the same protections for its documents as those afforded by the Protective Order already in place between" ERS and Salmeron. Salmeron claims that phrase meant the ERS protective order governed the "attorneys' eyes only" agreement. Following that logic, Salmeron argues the Guarantee Services Agreement was not protected because it (1) was not stamped "CONFI-

DENTIAL" and (2) was not the subject of a motion seeking the lower court's approval of the confidentiality designation—both of which, Salmeron claims, are prerequisites under the protective order between ERS and Salmeron for confidential protection.

We reject the premise. Sweet's statement does not say anything about the "attorneys' eyes only" agreement. The "attorneys' eyes only" agreement required Sanchez to treat the confidential documents of USA Funds as for "attorneys' eyes only" until such time as a protective order could be entered. That was the extent of the agreement; it was merely a stopgap until the district court entered a protective order governing USA Funds's confidential documents. While the protective order eventually entered by the district court governing discovery between Salmeron and USA Funds set forth the same procedures for determining confidentiality as the ERS protective order, Sanchez's unauthorized disclosure of the Guarantee Services Agreement occurred *before* that order was in place. Salmeron therefore cannot now claim that USA Funds was required to follow the provisions of an order that was not yet in place—especially because Sanchez failed to return the draft protective order with his proposed changes to USA Funds's counsel, thereby preventing the protective order from being entered in the first place.

Salmeron also claims that the district court clearly erred in finding that Sanchez's disclosure of the Guarantee Services Agreement was willful, thereby triggering the court's inherent power to sanction. *See Greviskes v. Universi-*

*ties Research Ass'n, Inc.*, 417 F.3d 752, 759 (7th Cir. 2005) ("Dismissal is appropriate where a party has displayed fault, bad faith, or willfulness."); *see also Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir. 1996). We conclude, however, that the district court did not clearly err in finding willfulness. Before the district court, Sanchez admitted that he indeed did disclose the Guarantee Services Agreement—not once, but *three times* in violation of the "attorneys' eyes only" agreement: to his client, another lawyer, and the reporter for the *Chronicle*. Sanchez admitted that the other attorney to whom he disclosed the document may have been the source of the Wikileaks posting. And his disclosure to the reporter for the *Chronicle* is especially telling. A reasonable person should know that giving a sensitive document to a member of the press, particularly one whose interest in the document was so keen that Sanchez repeatedly had to "put him off," almost inevitably will lead to its publication. That alone is more than sufficient to support the district court's finding of willfulness. *See Stive v. United States*, 366 F.3d 520, 522 (7th Cir. 2004).

Salmeron nevertheless maintains that Sanchez's disclosures were merely negligent. She claims that Sanchez misplaced the cover letters accompanying USA Funds's document disclosures and thus did not know that the Guarantee Services Agreement was confidential. But, given Sanchez's shifting stories, the district judge was entitled to disbelieve that explanation. At first, Sanchez did not deny disclosing the document in his email response to USA Funds's counsel, instead blaming USA Funds for failing to specifically mark it confidential and

move for a protective order. Later on, Sanchez claimed it had "been leaked and published without plaintiff's counsel's knowledge or approval." Still later, after the district court confronted him with the Bates stamping on the Wikileaks document, Sanchez admitted he had "exercis[ed] bad judgment" and leaked it to three different sources. Only in his final response to USA Funds's motion to dismiss did Sanchez raise the misplaced cover letter explanation. The district court found that Sanchez's contradictory excuses were "totally unconvincing" and that "no real explanation ha[d] been offered" for the unauthorized disclosure. Hence, the district court's finding that Sanchez willfully disclosed the Guarantee Services Agreement was not clearly erroneous.[3]

With the facts firmly established, we now turn to Salmeron's other challenges to the district court's sanction of dismissal. Salmeron first argues that the district court should not have sanctioned her because no protective order was in place disallowing the disclosure. In support of that argument, Salmeron cites *Jepson, Inc. v. Makita Electric Works, Ltd.*, 30 F.3d 854 (7th Cir. 1994). In that case we stated, "Absent a protective order, parties to a law suit may disseminate materials obtained during

---

[3] We do not discuss Salmeron's challenge to the district court's finding that the Guarantee Services Agreement involved trade secrets because that finding is not implicated in this appeal. The real issue is whether Sanchez willfully violated his agreement with opposing counsel when he leaked the Guarantee Services Agreement, not whether that document actually deserved confidential treatment.

discovery as they see fit." *Jepson*, 30 F.3d at 858. The problem with that argument, however, is it ignores the "attorneys' eyes only" agreement. Sanchez voluntarily entered into that agreement. As discussed above, that agreement restricted Sanchez from disseminating the Guarantee Services Agreement. Sanchez clearly violated the agreement when he shared that document with third parties.

We also reject Salmeron's related contention that the district court was required to find "good cause" for keeping the Guarantee Services Agreement confidential before sanctioning Sanchez for his unauthorized dissemination of that document. It is of course true, as *Jepson* holds, that a district court is required to "independently determine if 'good cause' exists" before judicially protecting discoverable documents from third-party disclosure. 30 F.3d at 858; *see also* Fed. R. Civ. P. 26(c). But in this case the district court never had that opportunity because Sanchez short-circuited the protective-order process. When delivering the draft protective order to Sanchez, Sweet wrote to Sanchez that USA Funds would move for confidential treatment of the Guarantee Services Agreement after Sanchez made his changes and the district court entered the order. Sanchez responded that he would look over the proposed order and would "give [USA Funds] any feedback or proposed modifications" he might have. Had Sanchez done what he told USA Funds's counsel he was going to do, USA Funds would have had an opportunity to present the proposed protective order to the district court along with a motion seeking confidential protection for the Guarantee

Services Agreement. In turn, the district court would have had an opportunity to rule on whether there was good cause to keep the document confidential. But Salmeron's attorney instead chose to bypass the district court's prerogative to determine confidentiality when he divulged the document himself before submitting his changes to the proposed protective order. Salmeron therefore cannot now complain of a lack of a ruling on good cause.

Despite Sanchez's failure to return his modifications, Salmeron nevertheless claims that USA Funds was at fault for the absence of a protective order because, according to Salmeron, it was unreasonable for USA Funds's lawyers to wait more than 17 months for Sanchez's feedback on the draft protective order. Counsel for USA Funds had an independent obligation to its client, and Salmeron contends its lawyers should have moved for confidential protection of the Guarantee Services Agreement "promptly when it did not hear back from Mr. Sanchez." Because USA Funds's lawyers did not so move, Salmeron argues that she should not face sanctions for their failure to protect their client.

It does appear that nothing prevented USA Funds's lawyers from protecting their client's interests sooner, and perhaps they should have. But Salmeron's argument essentially boils down to faulting USA Funds's lawyers for not protecting their client from an adversary who might not be trustworthy. We cannot accept that assertion. Attorney integrity is fundamental to the judicial process. The rules of conduct governing the profession prohibit

lawyers from engaging in conduct that involves dishon-
esty and misrepresentation. *See, e.g.*, Model Rules of
Prof'l Conduct R. 8.4(c); Model Code of Prof'l Responsi-
bility DR 1-102(A)(4); N.D. Ill. R. 83.58.4(a)(4); Ill. S. Ct. R.
Prof'l Conduct 8.4(a)(4). And the Seventh Circuit's Stan-
dards for Professional Conduct specifically state that a
lawyer is permitted to rely on opposing counsel's
promises and agreements. Practitioner's Handbook for
Appeals, *Standards for Prof'l Conduct within the Seventh
Judicial Circuit*, at 143 ¶ 6 (2003). We therefore find
Salmeron's argument that USA Funds's attorneys ought
to have been more wary of the opposition completely
unpersuasive. Sanchez agreed to keep USA Funds's
confidential documents for "attorneys' eyes only." He
also promised to get back to USA Funds's lawyers about
his proposed changes to their draft protective order. The
attorneys for USA Funds were entitled to take Sanchez
at his word.

Salmeron also complains she was not adequately
warned that dismissal would result from the disclosure
of the Guarantee Services Agreement. We disagree.
Sanchez received a "warning shot" when, after
repeatedly trying the court's patience, the district court
dismissed the lawsuit without prejudice. After
reinstating the suit, the court explicitly told Sanchez that
he was receiving his "final warning" and that any
further misconduct was likely to result in a more
drastic sanction. That warning still should have been
fresh in Sanchez's mind when, just one month later, he
willfully disclosed the Guarantee Services Agreement

in violation of the "attorneys' eyes only" agreement. *See Williams v. Chicago Bd. of Educ.*, 155 F.3d 853, 858-59 (7th Cir. 1998) (finding adequate notice where district court previously had sanctioned the plaintiff and warned that further sanctions would ensue from continued abuse of the judicial process).

But, Salmeron protests, the district court's previous warning did not encompass Sanchez's disclosures because they "differed in kind" from his earlier transgressions. While true, that reasoning *supports* the district court's decision rather than undermining it. If Sanchez's previous litigation abuses had prompted the district court to flirt with dismissal, he certainly should have expected his willful violations of an agreement with opposing counsel—a far more serious set of offenses—"to be answered with dismissal." *Fed. Election Comm'n v. Al Salvi for Senate Comm.*, 205 F.3d 1015, 1019 (7th Cir. 2000).

Salmeron next contends that the district court abused its discretion by dismissing her potentially meritorious lawsuit when, according to Salmeron, Sanchez's misconduct had "no meaningful impact on the course of litigation." We reject that argument for two reasons. First, Salmeron presents little more than her personal opinion to support her assertion that her lawsuit had merit. Second, contrary to Salmeron's contention, we do not require a district court to measure the impact on the litigation of a wrongdoer's willful misconduct before it issues a dismissal sanction. *See Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993) ("We continue to

eschew grafting a requirement of prejudice onto a district court's ability to dismiss or enter judgment as a sanction under its inherent power."). A district court certainly can consider the extent of the prejudice to the opposing party when determining an appropriate sanction. But a district court's inherent power to sanction for violations of the judicial process is permissibly exercised not merely to remedy prejudice to a party, but also to reprimand the offender and "to deter future parties from trampling upon the integrity of the court." *Dotson v. Bravo*, 321 F.3d 663, 668 (7th Cir. 2003).[4]

---

[4] Salmeron asserts that the district court failed to consider lesser sanctions. But that claim does not square with the record. The district judge stated during the July 3, 2008, hearing that, while he believed sanctions were in order for Sanchez's improper disclosure of the Guarantee Services Agreement, he still had yet to "defin[e]" the "appropriate sanction." As he told Sanchez, "[M]y question of you I guess is: Why shouldn't what I think is really a serious abuse call for, if not dismissal, then what? And that's what I would like you to respond to." Accordingly, the district court permitted Salmeron's counsel to file a brief explaining why a lesser sanction than dismissal would be appropriate. Salmeron's claim that the district court refused to consider the availability of lesser sanctions is thus without merit.

Salmeron also contends that she was "totally blameless" and was therefore disproportionately punished for her counsel's bad actions. That argument gets nowhere. "The rule is that *all* of the attorney's misconduct . . . becomes the problem of the

(continued...)

Lastly, Salmeron argues that the interests of the government will be harmed by the dismissal of her suit.[5] While

---

[4] (...continued)

client." *Bakery Mach. & Fabrication, Inc. v. Traditional Baking, Inc.*, 570 F.3d 845, 848 (7th Cir. 2009). Salmeron's "beef" is with her lawyer, not the district court's ruling. *Id*.

[5] As a reason for prejudice, Salmeron asserts that the statute of limitations "may" have run on the government. That assumes that the government is not bound by the district court's dismissal with prejudice of Salmeron's suit, a questionable assumption after *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 (7th Cir. 2009). In that case, the district court dismissed the relator's suit with prejudice but stated in its order that the dismissal was without prejudice to the United States. We rejected that attempt to keep the option open for the United States to bring suit on its own behalf: "when the judge dismissed the *qui tam* suit with prejudice, Lusby, the United States, and all other potential relators were bound." *Lusby*, 570 F.3d at 853. We stated that "[t]he United States must protect its interest by intervening in a *qui tam* action rather than by asserting a right to file a False Claims Act suit after the defendant has prevailed." We need not dwell on the question of whether the government could file suit after Salmeron's action was dismissed with prejudice, however, because the government showed no interest in intervening in her suit.

Salmeron also claims that the district court violated 31 U.S.C. § 3730(b)(1) by failing to obtain the Attorney General's written consent before dismissing the action. Such consent is not required, however, for suits like Salmeron's that are involun-

(continued...)

that may or may not be true—Salmeron has failed to show that her suit has merit—we reject that argument as a reason to withhold the dismissal sanction. The government was given ample opportunity to protect its own interests in this case. It was served with the initial complaint as well as every other document filed in this case, including the district court's first order dismissing the suit for want of prosecution and USA Funds's motion asking the court to sanction Sanchez for the disclosure of the Guarantee Services Agreement by dismissing the suit. The government therefore had notice of Sanchez's misconduct and could have intervened. *See* 31 U.S.C. § 3730(b)(2), (c)(3).

In sum, we hold that the district court did not abuse its discretion in dismissing Salmeron's suit with prejudice as a sanction for Sanchez's unauthorized disclosure of the Guarantee Services Agreement. While harsh, the sanction was merited. *See Patterson by Patterson v. Coca-Cola Bottling Co. Cairo-Sikeston, Inc.*, 852 F.2d 280, 284-85 (7th Cir. 1988). Sanchez disregarded his obligations as an officer of the court when he violated the agreement he had made with USA Funds's

---

[5] (...continued)

tarily dismissed. *See United States ex rel. Shaver v. Lucas W. Corp.*, 237 F.3d 932, 934 (8th Cir. 2001); *Minotti v. Lensik*, 895 F.2d 100, 103 (2d Cir. 1990) (per curiam); *see also Searcy v. Philips Elecs. N. Am. Corp.*, 117 F.3d 154, 158 (5th Cir. 1997) ("[T]he government forthrightly acknowledges that requiring the government's consent to an involuntary dismissal would raise separation-of-powers concerns.").

counsel and leaked the Guarantee Services Agreement. His decision to leak the document before a protective order was entered further subverted the administration of justice by highjacking the district court's prerogative under the Federal Rules of Civil Procedure to determine what documents are confidential. Moreover, we cannot ignore that Sanchez's violation of his agreement with opposing counsel came on the heels of a pattern of abuse of the judicial process, a pattern that involved his repeated disregard for court-ordered deadlines and failures to appear at court-mandated status hearings, and a pattern for which Sanchez had already received a "final warning" that further misconduct would not be tolerated. The district court showed extensive patience with Sanchez's dilatory, even defiant, conduct. But faced with an even more flagrant offense by Sanchez after previously giving him a "final warning," the district court certainly was entitled to say, "enough is enough." *Pyramid Energy, Ltd. v. Heyl & Patterson, Inc.*, 869 F.2d 1058, 1062 (7th Cir. 1989).

III.

The district court did not clearly err in finding that the "attorneys' eyes only" agreement encompassed the Guarantee Services Agreement, nor did it clearly err in finding that Sanchez had willfully violated the "attorneys' eyes only" agreement by leaking the Guarantee Services Agreement to unauthorized third parties. Moreover, in light of Sanchez's continuing pattern of misconduct for which he had been given a "final warning," the district

court did not abuse its discretion in dismissing Salmeron's suit with prejudice as a sanction for the willful leaks of the document. The judgment of the district court is AFFIRMED.